```
 1   day?
 2           A.   Yes.  Yes.  And there was -- yeah.
 3   Nobody was happy in the end.
 4           Q.   Okay.  I guess they call that a good
 5   deal.
 6           A.   I guess so.  I guess so.
 7           Q.   But they didn't sue you or take you to
 8   court for that?
 9           A.   No, no.  We never went to court.
10           Q.   So I want to go back to your -- the day
11   of your injuries.  You have this accident.  I'm
12   assuming you were in a lot of pain?
13           A.   Yes.
14           Q.   All right.  I assume you got taken to
15   the hospital?
16           A.   Yes.
17           Q.   Okay.  And was an ambulance called to
18   take you there?
19           A.   Yes.
20           Q.   Do you know which hospital you went to?
21           A.   Yeah.  It's Summit Medical Center.
22           Q.   Okay.
23           A.   In Frisco.
24           Q.   And did you go to the emergency room?
25           A.   Yes.
```

Page 13

1      Q.   And did you sign a bunch -- do you
2 remember if you had to sign a bunch of papers when
3 you got there?
4      A.   A few.
5      Q.   Okay.
6      A.   I was very clear that -- this happened
7 at work, and I was very clear that I wasn't going to
8 sign anything that said I was going to be
9 responsible, because I don't have any insurance.
10     Q.   Okay.  You had no other -- no health
11 insurance, no private insurance?
12     A.   I have private insurance.  It's tied up
13 right now with the Colorado Attorney General's Office
14 on a fraud case because they paid nothing.
15     Q.   Okay.  Did you provide any insurance
16 information at all to them?
17     A.   Yes, I did.
18     Q.   Okay.
19     A.   This insurance company I was telling
20 you, it's First Health.
21     Q.   Is that the full name?  Do you recall?
22     A.   That's -- yeah, that's all I know it
23 as.
24     Q.   Okay.  And --
25     A.   You know, I may be mistaken.  Maybe I

1  Atlas two times in reference to this before I
2  contacted BC Services.  Yeah, I did that, and I know
3  you probably don't -- let me just make sure I'm not
4  trying to deceive you here.
5         **Q.   No.  I want to make sure you're giving**
6  **me the most accurate answer you can.**
7         A.   So I called BC Services and explained
8  to them, Look, I'm not responsible for this.  This is
9  a Pinnacol thing.  She says, Oh, yeah, okay.
10             And then I called Atlas back again and
11  said, Well, this is what happened.  Atlas said, Call
12  them back and ask --
13             MR. VOLHEIM:  Mr. Edwards, hold on.
14  Hold on, hold on.
15             I'm going to object, Mr. -- you don't
16  want to talk -- I've been pretty lenient about this,
17  but I'm going to have to start objecting if we're
18  talking about communications between my client and
19  his attorney.  This is protected under
20  attorney-client privilege.
21             So Mr. -- I don't want you to talk
22  about any conversations that you've had with me or my
23  staff.  Okay?
24             THE DEPONENT:  Okay.  I understand,
25  sir.

```
 1   it.
 2             Q.   Okay.  Let me ask you this.  I'm going
 3   to point to the very lower, left-hand corner, and
 4   there's a -- what appears to be a signature.  I have
 5   my pen pointed over it.  Does that appear to be your
 6   signature?
 7             A.   It could be.
 8             Q.   Okay.  Does it look similar to your
 9   signature?
10             A.   Similar.
11             Q.   Okay.  Do you recall signing an
12   agreement with Consumer -- or Atlas Law Group to have
13   them represent you?
14             A.   Yes.
15             Q.   And did you -- that document that's
16   dated December 19th, 2018, do you think that's when
17   you may have signed that document?
18             A.   Could have been.
19             Q.   Put it this way.  You had definitely
20   retained Consumer -- Atlas Consumer Law, which
21   represents you in this matter?
22             A.   Yes.
23             Q.   And you had signed an agreement to have
24   them represent you in this matter?
25             A.   Yes.
```

Case 1:18-cv-03322-STV   Document 17-1   Filed 09/24/19   USDC Colorado   Page 5 of 20

| Clifford L. Edwards vs. BC Services, Inc. | Deposition of Clifford L. Edwards July 11, 2019 |
|---|---|

Page 43

 1        Q.   Okay.  And you had called BC Services a
 2   second time on December 19th, 2018.  Do you recall
 3   that?
 4        A.   Yes.
 5        Q.   Do you recall if that was before or
 6   after you signed this agreement that's Exhibit 2?
 7        A.   I don't recall.
 8        Q.   But you do recall that in between the
 9   December 18th phone call and the December 19th phone
10   call you had a conversation with an attorney from
11   Atlas Consumer Law Group?
12        A.   Yes.
13        Q.   And based on that conversation you
14   called BC Services on December 19th, 2018?
15        A.   Yes.
16        Q.   Why did you call them?
17        A.   I wanted to find out what was going to
18   happen with this -- with this case.  After I
19   explained to them that I'm not responsible for it.
20        Q.   Okay.  Well, let me ask you this.  You
21   hired this law firm to represent you, right?
22        A.   Yes.
23        Q.   So why would you call instead of having
24   your lawyer call?
25        A.   I've been advised not to answer that

Case 1:18-cv-03322-STV   Document 17-1   Filed 09/24/19   USDC Colorado   Page 6 of 20

| Clifford L. Edwards vs. BC Services, Inc. | Deposition of Clifford L. Edwards July 11, 2019 |
|---|---|

Page 46

```
 1                  (The phone call was played.)
 2                  MR. BORENSTEIN:  Let's go back on the
 3      record.
 4           Q.   (By Mr. Borenstein)  Mr. Edwards, did
 5      you listen to that phone call?
 6           A.   Yes, I did.
 7           Q.   And, again, does that sound like it's
 8      your voice on the call?
 9           A.   Yes.
10           Q.   And as far as you can tell does that
11      accurately represent the content of that phone call?
12           A.   Yes.
13           Q.   And you did listen to the phone call
14      just now?
15           A.   Yes, I did.
16           Q.   Okay.  Did the representative from BC
17      Services say at any time in that phone call that they
18      were going to pursue the claim against you?
19           A.   That's how I interpret it.
20           Q.   My question is did she say, We're going
21      to pursue the claim against you?
22           A.   I didn't hear those exact words.
23           Q.   All right.  So that would be a no?
24           A.   I did not hear those exact words.
25           Q.   Just said, We want to collect the bill?
```

1  that you talked to BC Services twice?
2      A.  Yes.
3      Q.  And you listened to both of the phone
4  calls, December 18th and December 19th, 2018?
5      A.  Yes.
6      Q.  And would you agree with me that,
7  although you did say it was covered by workers'
8  compensation and you shouldn't have to pay it, you
9  didn't provide a claim number or contact, claims
10 adjustor at Pinnacol Assurance?
11     A.  I provided that to somebody.
12     Q.  Okay.  Well, what I'm saying is that in
13 those two phone calls you didn't?
14     A.  No, not in those two phone calls, no.
15     Q.  Okay.  Going back to Paragraph 20 of
16 the Complaint, it's alleged that BC Services
17 persistently held they were going to continue to seek
18 payment from plaintiff.
19         What is it that BC Services did or said
20 that would lead you to believe they persistently held
21 they were going to continue to seek payment from you?
22     A.  First, I received this letter, Exhibit
23 1.  Second, the first conversation that I had with
24 them and the second conversation I had with them.
25     Q.  Okay.  Well, the letter, the December

```
 1    11th letter, Exhibit 1, predates you providing them
 2    with any information at all.  Would you agree with me
 3    with that?
 4          A.   To BC Services?
 5          Q.   Yeah, right.
 6          A.   Yeah.
 7          Q.   So that couldn't be a basis for saying
 8    -- would you agree that cannot be a basis for them --
 9    BC Services saying they would continue to seek
10    payment from you?
11          A.   No.
12          Q.   You didn't talk to them.
13          A.   You're going to have to ask that again.
14          Q.   Sure.  Sure.  So you didn't provide any
15    information to BC Services prior to getting
16    Exhibit 1?
17          A.   To BC --
18          Q.   Yes, BC Services.
19          A.   Well, indirectly I did.
20          Q.   Okay.  Well, I'm talking about
21    directly.
22          A.   No, never heard of them before I got
23    this.
24          Q.   All right.  And the only time you heard
25    from BC Services -- not the calls that you made to
```

1  attorney have heard from BC Services to collect this
2  debt?
3          A.  I don't know what my attorney has
4  heard.
5              MR. VOLHEIM:  Just a minute,
6  Mr. Edwards.  Objection.  It calls for speculation as
7  to what his attorney has heard.
8              You can answer the question,
9  Mr. Edwards.
10         A.  I don't know what my attorneys have
11  heard.  I have not heard anything.
12         Q.  (By Mr. Borenstein)  Okay.  Now, you'd
13  mentioned just now on that December 18th phone call,
14  the first phone call, that you were concerned that
15  the BC Services representative just didn't agree with
16  you and say, Oh, yeah, this is not covered -- or this
17  is covered by workers' compensation?
18         A.  I'm not sure if she didn't agree with
19  me.  She just didn't come up with any plan.  Oh, this
20  is what's we're going to do.  We're going to take it
21  to this or that or the other.  Just, Okay.  And so
22  it's like, Okay, well, we're going to come after you.
23         Q.  But she didn't say they were going to
24  come after you, did she?
25         A.  No.

**Scan**



Exhibit B

Printed on 8/23/2019 10:36 PM
Case 1:18-cv-03322-STV   Document 17-1   Filed 09/24/19   USDC Colorado   Page 11 of 20
Page 2 of 2

**Scan**

524110867  PO BOX 354   DILLON   CO   80435  CH124208868   8064419254  11/28/1959   7.2

Exhibit C

0300-COMMERCIAL INSURANCE     LHE0082399  .  0100-SELF PAY INSURED     6/7/2018  7/30/2018  -28.81

CLIFFORD   LEES   EDWARDS   CLIFFORD   LEES   EDWARDS

B

**Date:** December 11, 2018    L35852-#101
**Creditor:** COLORADO IMAGING ASSOCIATES
**Account #:** 16106121

**Principal:** $7.20    **Interest:** $0.00    **Balance:** $7.20

DEPT 233    6824908518121
PO BOX 4115
CONCORD CA  94524

| IF PAYING BY CREDIT CARD, PLEASE FILL OUT BELOW |
| --- |
| ☐ Mastercard  ☐ Visa |
| Card Number | Exp. Date (Required) |
| Signature | Amount |

720-494-2980    1-866-822-1798

ADDRESS SERVICE REQUESTED

CLIFFORD LEES EDWARDS
PO BOX 354
DILLON CO 80435-0354



**REMIT TO:**
BC Services, Inc.
P.O. BOX 1317
Longmont, CO  80502-1317

Please indicate current address and phone:  (     )    Address:

Please return the above portion with payment

Your creditor, listed above, has placed your account for collection.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request of this office in writing within 30 days after receiving this notice this office will provide you with the name and address of the original creditor, if different from the current creditor.

A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer.  A written request to cease communication will not prohibit the debt collector or collection agency from taking any other action authorized by law to collect the debt.

This communication is an attempt to collect a debt by a debt collector. Any information obtained will be used for that purpose.

FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.COAG.GOV/CAR

1-866-822-1798 --

**BC Services, Inc.**  *  550 Disc Dr  Longmont CO 80503
720-494-2980    1-866-822-1798
Hours of operation Mon - Fri 8AM to 5PM (MST)

Pay online at **www.paymybcsaccount.com**
Access Code: **1.12144059.505**

BCD101-1211-1123629191-01174-1174

Exhibit D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action Number 1:187-cv-03322-STV

Clifford L. Edwards,

    Plaintiff,

v.

BC Services, Inc.,

    Defendant.

## AFFIDAVIT OF BRETT P. RILEY

STATE OF COLORADO    )

COUNTY OF BOULDER    )

I, Brett P. Riley, being first duly sworn upon oath, depose and states as follows:

    1.    I am general counsel for BC Services, Inc. (BC). I have held this position since November 2015. I am also an attorney licensed to practice law in Colorado since 2002. I have personal knowledge of the facts and circumstances surrounding BC's methods of operations and doing business with respect to Colorado Imaging Associates (CIA) as well as BC's file for Plaintiff that is a regularly kept business record.

    2.    According to BC's records, on June 7, 2018 Plaintiff went to Summit Medical Center for injuries he sustained in an accident.

    3.    Plaintiff provided the hospital with information indicating he had health insurance with a private carrier, specifically, Blue Cross/Blue Shield.

    4.    CIA was among the healthcare providers who rendered services to Plaintiff. In keeping with its custom and practice CIA billed Plaintiff's insurance carrier for the services it rendered.

5. On or about July 30, 2018 CIA received payments and adjustments from the insurance carrier. There was a remaining balance due to CIA in the amount of $7.20 after the insurance carrier paid.

6. On December 10, 2018 CIA referred the $7.20 debt to BC to collect. CIA transmits accounts to BC electronically. The information for each account is set forth on a spreadsheet in the format provided in Exhibit C. The spreadsheet contains information identifying the debtor, the debtor's address, date of birth, date of services rendered, the debtor's insurance information, if any, the amount claimed due, and any payments made on the account. The spreadsheet provided in this case stated Plaintiff had a private insurance, that insurance paid a portion of the bill, and there was a balance due of $7.20. The spreadsheet did not contain any information that the debt arose from a workers' compensation claim or that it was covered under the workers' compensation policy of Plaintiff's employer.

7. December 11, 2019 BC sent a collection notice (the Letter) to Plaintiff that he owed a debt to CIA. The Letter stated among other things, "Principal: $7.20 Interest: $0.00 Balance: $7.20."

8. The Letter accurately stated the balance due on the debt. I am aware that under Colorado law a creditor may request interest on a debt from the date of the wrongful withholding or after the debt becomes due, whichever occurs first. In this instance, BC did not seek interest on the debt as of the date of the Letter and for that reason the amount of interest was set forth as $0.00.

9. BC had no knowledge that the debt was covered under a workers' compensation policy until Plaintiff's December 18, 2019 phone call. BC has many

healthcare clients. When it receives information that a debt may be covered by workers' compensation no further collection efforts are made until BC may investigate that claim. Here, no further collection efforts were made for the additional reason that Plaintiff advised he was represented by attorney.

10. I reviewed the December 18, 2018 and December 19, 2018 phone calls placed to BC by Plaintiff. In neither call did BC's representative state the amount of the debt may change nor did the representative request payment of the debt from Plaintiff.

11. On December 19, 2018, approximately two hours after Plaintiff's second phone call, a representative from Pinnacol Assurance called BC, advised the debt was covered by workers' compensation, and that it will pay the debt.

12. Pinnacol Assurance subsequently covered the debt in full. No other charges were added on or sought by BC.

13. CIA has referred accounts to BC for collection since 2013. Currently, CIA refers anywhere from1,500 to 3,000 accounts per month.

14. BC relies on the information provided to it by CIA. The spreadsheet – Exhibit C – is representative of the information submitted by CIA when it refers an account. The information provided typically includes the person's name, address, phone number, date of birth, social security number, payment history, insurance information, and driver's license, if available. In reviewing Exhibit C I am able to conclude that this information was provided by CIA with the exception of Plaintiff's driver's license. I did not see anything in Exhibit C that would indicate a possible workers' compensation claim or that the debt would be covered under a workers' compensation policy.

3

15. BC's reliance is reasonable because CIA has a history of providing reliable information and represents to BC that it provides accurate information on each account it refers. Due to the volume of accounts referred, BC would be unable to competently collect debts referred by CIA if the information provided was not accurate.

16. Based on the foregoing BC had no reason to believe the debt was covered by workers' compensation until informed by Plaintiff in the December 18, 2018 phone call.

Dated September 24th, 2019.

_____
Brett P. Riley

Subscribed and sworn to before me this 24 day of September, 2019 by Brett P. Riley.

WITNESS my hand and official seal.

My commission expires:

(SEAL)

_____
Notary Public

SHANICE VALENCIA
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144044723
My Commission Expires November 20, 2022

4